UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---------------------------------------------------------x

MARJORIE DERVEN,

                              Plaintiff,

 - against -                                                                        05 Civ. 2290 (CM)(MDF)

PH CONSULTING, INC. D/B/A
ADVANTIS RESEARCH & CONSULTING,

                              Defendant.

---------------------------------------------------------x

DECISION AND ORDER GRANTING IN PART AND DENYING IN
PART DEFENDANT'S MOTION FOR SUMMARY JUDGMENT AND
DENYING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT

McMahon, J:

## I. Introduction

Plaintiff Marjorie Derven was a salesperson and project manager in the employ of defendant Advantis Research and Consulting. Her compensation included a fixed annual salary plus a 10% commission on all new business she generated.

In 2000, Derven negotiated a series of agreements with Eli Lilly, the pharmaceuticals giant, for Advantis to conduct two large-scale market research studies. These projects were far beyond Advantis' capabilities, so Advantis formed a joint venture with Martin Hamblin, a much larger consulting company. By the terms of that agreement, Martin Hamblin received 85% to 95% of the contract payments.

While negotiating with Eli Lilly and Martin Hamblin, Derven also reached out to Paul Habegger, her supervisor, to renegotiate her commissions for the Lilly projects. Both agreed that

some alternative form of commission agreement would be required, but there is substantial disagreement over whether any agreement was reached.

Ultimately, Derven received commissions on the Lilly projects equal to 10% of the margin amount of each contract – that is, the contract price less the amount due to Martin Hamblin for its work.

Derven now contends that her employment agreement entitled her to a commission of 10% of the total contract amount, even though her employer, Advantis, did not receive 10% of the contract price. She seeks damages on theories of breach of contract, unjust enrichment, and fraud.

Defendant counterclaims for misappropriation of trade secrets, breach of the duty of good faith and loyalty, and unfair competition, based on Derven's conduct between the year 2000 and her resignation in 2004. It alleges that Derven formed a competing consulting firm and operated that firm for her own benefit between 2001 and 2004, while still employed at Advantis. It further alleges that she wrongfully made use of Advantis' trade secrets and internal documents for the benefit of her own firm before and after her resignation.

Both parties now move for summary judgment. For the reasons stated below, Derven's motion is denied, and defendant's motion is granted in part and denied in part.

## II. Facts

A. Background

Defendant PH Consulting, Inc., doing business as Advantis Research and Consulting ("Advantis") is a market research and consulting firm based in St. Paul, Minnesota. Plaintiff Marjorie Derven is a resident of Rockland County, New York, and was employed by Advantis as a salesperson and project manager. Defendant's Statement of Material Facts ¶ 1.

Derven's main duty was to attract new business for Advantis, negotiate the terms and scope of new projects, and oversee Advantis' execution of those projects. Def. SOMF ¶ 3. Her other responsibilities included keeping track of project milestones and deliverables and hiring outside consultants when needed. Deposition of Marjorie Derven ("Derv. Dep.") at 40, 67. She had no managerial responsibilities. Id. at 63, 74. She reported directly to Paul Habegger, Advantis' president. Def. SOMF ¶ 4.

Advantis' offices are located in St. Paul, Minnesota; Derven worked out of her home office in New York. Derv. Dep. at 65. As part of Derven's employment, Advantis paid for a phone line and Internet data connection to her home, and provided her with a fax machine, printer, personal computer and office supplies. Id. at 65-66, 472-76.

Derven had previously been employed in essentially the same role by Advantis' predecessor firm, Business Dynamics, Inc. (BDI), of which Habegger was a part-owner. In late 1998 and early 1999, the partnership behind BDI broke up, and Habegger left BDI to start Advantis. Derv. Dep. at 45-46. At the time of the breakup, Derven was earning $80,000 per year, plus benefits, plus a 10% commission on new contracts. Id. at 45.

When Habegger founded Advantis, Derven left BDI and moved to the new firm. Id. at

46. She continued to be paid at the same rate ($80,000 a year and a 10% commission) and believed that all other terms of her employment remained unchanged. Def. SOMF ¶ 5; Derv. Dep. at 59.

Now, years after the fact, the parties cannot agree as to how plaintiff's commission was calculated. It is Derven's contention that a "10% commission" entitled her to 10% of the contract price – that is, 10% off the top of the gross amount billed to the client prior to the deduction of expenses. Id. at 93. Derven does not recall any specific verbal agreement to that effect (id. at 91-92), but she believed the phrase to be "extremely straight-forward." Id. at 86. There were certain exceptions to this rule – from time to time, Derven took over a project based on a lead generated by a co-worker, and the two would split the 10% commission. Id. at 86. In one other case, Derven agreed to waive her commission entirely when a contract with Cigna Health Care turned out to generate a loss to Advantis. Id. at 97. However, these exceptions were based on explicit oral modifications based on her conversations with Habegger. Id. at 93.

Habegger, however, asserts that Derven's 10% commission was based on the "invoice" or "margin" amount of contracts – meaning 10% of the contract price less "travel expenses, living expenses, honorarium, printing costs, mailing costs, Federal Express, sometimes courier charges and, of course, in the two projects subject to this litigation, Martin Hamblin costs." Deposition of Paul Habegger ("Hab. Dep.") at 25.

Derven had signed a written employment agreement when employed at BDI, but had no written employment contract with Advantis. Hab. Dep. at 24, 276. According to Habegger, she was asked to sign an Advantis employment agreement on several occasions, but refused. Id. at 25. No copy of any proposed employment agreement is provided in the record.

B. Plaintiff's Early 2000 Commissions

Defendant has submitted a spreadsheet entitled, "Marjorie's 2000 Sales and Commissions," listing what appear to be all contracts booked by Derven in 2000. McDonough Declaration in Support of Defendant's Motion, Ex. I. Each project listed has an associated "Sale Amount," "Martin Hamblin Contract Amount," "Actual Sale Amount" (apparently the difference between the Sale Amount and the Martin Hamblin Contract Amount) and "Commissions to Margie," (10% of the "actual sale amount").[1] Id. According to the spreadsheet, prior to August, 2000, the "Sale Amount" and "Actual Sale Amount" of all Derven's contracts were the same – implying that she was, at this time, receiving commissions equal to 10% of the contract price. The spreadsheet does not disclose the profitability of these contracts to Advantis, or how the projects were performed.

C. The Obesity Project

In mid-2000, Advantis began negotiating with the pharmaceutical firm Eli Lilly for two large market research projects – one on obesity, and the other related to the use of human growth hormone.[2]

The obesity project sought to analyze the market potential of an anti-obesity drug in four countries where obesity was viewed as a growing problem: the United States, Great Britain,

---

[1] The spreadsheet in fact contains two listings in which amounts are listed as due to Martin Hamblin, which were not deducted from the "actual sale amount" or Derven's commission. These projects involve Eli Lilly, but are not discussed in the record before this Court.

[2] According to Defendant's spreadsheet, Advantis contracted with Eli Lilly in July on two smaller studies related to fertility drugs. McD. Decl., Ex. I. Those contracts are not at issue here.

Brazil, and Germany. Derv. Dep at 136, McD. Decl., Ex. F. It was clear to Derven from the early stages of the project that it was "the biggest project that the company had taken on" (Derv. Dep. at 139) and that "there was no way we could do that project." Id. Habegger suggested that Martin Hamblin, a much larger consulting firm, be brought on to take over some or all of the project. Id. at 140. Derven met with Alan Bowditch, a representative of Martin Hamblin, and the two reached an agreement to divide the scope of work on the Lilly projects. Id. at 144. On August 14, 2000, the two firms entered into a preliminary joint venture agreement. McD. Decl., Ex. G. On October 11, 2000, Advantis and Martin Hamblin signed a letter of agreement specifying the scope of each party's responsibilities on the obesity project, with Martin Hamblin performing much of the work at a price of $983,310. McD. Decl., Ex. D. Advantis and Martin Hamblin also agreed that both firms would be listed on the project proposal, although only Advantis dealt with Lilly directly. Derv. Dep. at 144.

Having reached an agreement with Martin Hamblin, Derven then finalized the contract terms on the obesity study with Eli Lilly. The final contract price was $1,042,000; that amount, and the terms of the scope of work, were set forward in a proposal dated September, 2000. McD. Decl., Ex. F. The contract was signed on October 5 by Derven and a representative of Eli Lilly. Id. Despite the contract's October 5 date, Derven believes that the scope of the contract was largely set by August (Derv. Dep. at 161) and that work had already commenced by October. Id. at 216. No Martin Hamblin representative signed the contract, and the scope of work does not identify any tasks to be performed (or amounts owed) to that firm, although Martin Hamblin in listed as a partner in several sections. McD. Decl., Ex. F at 6-7, 20.

At one point during the Lilly negotiations, Habegger suggested that the entire contract be

turned over to Martin Hamblin; Derven, however, convinced him not to surrender the relationship with Eli Lilly and to keep Advantis' share of the work. Derv. Dep at 157-58.

In August, just before the terms of the contract were set (Derv. Dep. at 161), Derven met with Habegger concerning her commission for the obesity project. Id. at 160-61. She described the conversation thus:

> because I recognized that, you know, most of the money was going to Martin Hamblin, that he and I have a different commission structure for this particular project and that we split the margin, you know, the amount billed above what Martin Hamblin was being billed at a rate of 50/50, and he said, "I'm open to that," and that was the end of the discussion.

Id. at 160. She also states that "There was no agreement" (id.), although at the time she seems to have believed that Habegger accepted the arrangement. See § II.D *infra*.

In October, 2000, Derven submitted a New Sale Form related to the obesity project. McD. Decl., Ex. H. It states that the "amount of sale" was $1,042,000, but that $983,310 was "MH price to us." Id. The document also spells out the payment schedule for the project, with 50%, or $29,345, billable immediately, 35%, or $20,541 billable at the start of the quantitative study, and 15%, or $8,803.50, due at the end. Id. Payroll employees apparently wrote on the form that the "Actual Sale" amount was $58,690. Id.; Derv. Dep. at 240.

In October, 2000, Derven was paid a commission of $5,869, "based on actual sale amount." McD. Decl., Ex. I. When she received it, she was "extremely shocked" (Derv. Dep. at 166) and "felt completely tricked, because, I felt that it's true, he hadn't agreed to it [the 50% split], but he never proposed anything else." Id. at 167. She subsequently wrote a memorandum, dated October 10, 2000, requesting a raise and complaining that her commission for the obesity project was "not proportional to the sales achievement" and "de-motivating." Plaintiff's

Affidavit in Opposition to Defendant's Motion, Ex. 4. Her memorandum requested an increase in salary, increased 401(k) contributions, and increased payments into her deferred compensation plan. Id. It did not, however, mention any earlier agreement about a 50% share of the margin. Id.

Habegger replied with a memo stating that increased commission on the obesity project was not possible, as Advantis expected to clear only $2950, or 5% of the margin, after expenses. Pl. Aff.. Ex. 5. He then proposed that, if Derven could reduce the costs incurred in managing the Advantis portion of the Lilly contract, he would consider adding to her bonus 50% of the "discount" amount of $19,000.[3] Id. He also suggested that commissions on later Lilly contracts within the year might be handled in a similar manner. Id.

Derven acknowledges that she made no oral or written response to Habegger's request. Derv. Dep. at 185. Soon thereafter, she received a 10% share of the discount amount received from Martin Hamblin – $1,900. Derv. Dep. at 183.

Defendant's version of events is slightly different. Habegger acknowledges that Derven discussed her expected commission on the obesity project with him, including her idea of a 50% share of the margin. Hab. Dep. at 39-40. He told Derven that he would consider a 50% split of the margin only if Advantis could take the $58,690 as a finder's fee and turn performance of the contract over to Martin Hamblin. Id. at 39-40. If, however, Advantis had to expend resources to perform under the contract, he could only offer her 10% of the margin amount, $5,869, as a commission. Id. at 41. According to Habegger, Derven accepted this proposal approximately one week before the Lilly contract was signed. Id.

---

[3]The "discount amount" was a share of the contract price returned once Lilly reached a certain threshold in sales. Derv. Dep. at 183. The mechanism by which the amount was calculated is not specified.

Habegger also admits that he received and responded to Derven's October 10 memorandum, and that his response does not explicitly mention any prior agreement about her commission. Id. at 93. However, he believes that his response referred to it implicitly. Id.

D. The HGH Project

Advantis' second project with Eli Lilly, negotiated at roughly the same time as the obesity project, concerned market research into the distribution of human growth hormone, also known as humatrope or "HGH." Derv. Dep. at 228. This project was also a joint venture with Martin Hamblin; Martin Hamblin asked for, and received, $141,800 for its share. Id. at 245; McD. Decl., Ex. K. The total contract price was $165,000; the scope of work was set forth in a Letter of Agreement between Lilly and Advantis dated September 19, 2000. McD. Decl. Ex. J. This agreement, unlike the prior obesity study contract, contains a three page addendum bearing the Martin Hamblin logo that sets its share of the contract amount. Id.

There is no record of Derven and Habegger discussing her commission on the HGH contract specifically. However, in a fax to Advantis payroll dated September 12, 2000, in reference to the HGH contract, Derven asserted, "My agreement with Paul on these [Lilly projects] is that my commission is 50 percent of the margin." Derv. Dep. at 235. Derven asserts that, at the time, she believed the 50% split was still in force because Habegger had never explicitly rejected it. Id. at 236.

However, Derven did not receive 50% on the margin of the HGH contract; instead, she was paid a commission of $2,320, or 10% of the margin amount of $23,200. Id. at 245.

A third project with Lilly to conduct research on parathormone, or PTH, was cancelled,

and Derven received no commission from that contract. That contract is not at issue here.[4] Id.

E. Derven's Post-2000 Employment

Derven continued to work for Advantis until 2004. Derv. Dep. at 266. During 2001, three years before her resignation, she incorporated Hudson Research and Consulting Inc., of which she was president and sole shareholder. Derv. Dep. at 49-50. Hudson provides management consulting of a type similar to Advantis, and targets the same large financial institutions as clients. Id. at 253-54. It appears that plaintiff pursued projects for Hudson while still employed by Advantis.

In 2002 and 2003, Hudson sold several projects to Novartis, another large pharmaceutical company. Id. at 501-502. Derven allegedly negotiated these agreements during working hours while employed by Advantis (id. at 505), and apparently used the fax paid for by Advantis as Hudson's fax line. Id. at 521. At this time, Advantis was attempting to build a relationship with Novartis as well, with Habegger and Derven discussing potential leads and strategies. McDonough Declaration in Support of Defendant's Opposition, Ex. E-F. Derven did not disclose her independent relationship with Novartis through Hudson to Habegger or anyone else at Advantis. Derv. Dep. at 567.

Upon Derven's resignation from Advantis in 2004, she returned the hardware given to her by Advantis, and transferred ownership of phone lines and email addresses previously paid by Advantis to her own name. She also copied and retained numerous data files, including

---

[4]Defendant's spreadsheet listing Derven's 2000 commissions mentions a $75,000 "FSH" project for Eli Lilly. McD. Decl., Ex. I. Neither party mentions this project.

documents she drafted and other Advantis materials. Derv. Dep. at 269-71. This fact was also not disclosed to Advantis. Id. at 276. Derven contends that these documents did not contain proprietary information or trade secrets, and that she kept them only as copies of work that she particularly liked.

After her resignation, Derven filed suit against her former employer on theories of breach of contract, unjust enrichment, violation of New York Labor Law, and fraud, seeking damages of 10% of the full contract price on the obesity and HGH projects. Defendant, in its amended answer, raises counterclaims for breach of duty of loyalty and good faith, unfair competition, and misappropriation of trade secrets. Both parties now move for summary judgment.

### III. Discussion

A. Standard of Review

Under Federal Rule of Civil Procedure 56(c), the court will grant summary judgment if the evidence offered shows that there is no genuine issue as to any material fact and that the movants are entitled to judgment as a matter of law. See Celotex Corp. v. Catrett, 477 U.S. 317, 106 S. Ct. 2548 (1986). Furthermore, where a plaintiff cannot establish an essential element of his claim, "there can be 'no genuine issue as to any material fact,' since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." Id. at 322-33. On a motion for summary judgment, the court views the record in the light most favorable to the non-movants and resolves all ambiguities and draws all reasonable inferences against the movants. See United States v. Diebold, Inc., 369 U.S. 654, 655, 82 S. Ct. 993, 994 (1962); Donahue v. Windsor Locks Bd. of Fire Commn'rs, 834 F.2d 54, 57 (2d Cir. 1987).

B. Defendant's Motion for Summary Judgment

For the reasons set forth below, Advantis' Motion for Summary Judgment is granted as to plaintiff's claims for fraud and violation of New York Labor Law §§ 191-a through 191-c, and denied as to her claims for breach of contract and unjust enrichment.

*1. Breach of Contract & Unjust Enrichment*

Defendant argues that plaintiff's first cause of action – breach of contract – fails as a matter of law. First, Advantis asserts that no enforceable contract existed because Derven and Habegger failed to reach an agreement regarding Derven's commission on the Lilly contracts. It further argues that she waived any claim for a commission as to the Lilly contracts. Both arguments fail.

According to plaintiff, her baseline agreement with Advantis gave her 10% off the top of all contracts that she negotiated, and that no subsequent agreement as to the Lilly contracts modified that agreement. The course of dealing between the parties seems to support such a conclusion – defendant's own spreadsheet indicates that, prior to Advantis' dealings with Eli Lilly, Derven regularly received 10% of the contract amount prior to the deduction of expenses. It is equally clear that Derven, in her role as project manager, had worked with outside consultants on other contracts, yet payments to such consultants were not deducted from her commission. Those few exceptions to the rule – when Derven split a commission with a co-worker or returned her commission because a project failed to generate as much revenue as expected, were based on explicit oral agreements.

It appears that the parties never discussed the meaning of the phrase "10% commission,"

but the absence of a verbal agreement is not fatal to plaintiff's claims. As a general rule, the course of conduct between parties can, and must, be analyzed to determine whether there was a meeting of the minds sufficient to form an enforceable contract. Flores v. Lower E. Side Serv. Ctr., Inc., 4 N.Y.3d 363, 370, 795 N.Y.S.2d 491 (2005). In the context of employment contracts, payment of commissions, bonuses, and other alternate forms of compensation has been established by the conduct of the parties, rather than by express agreement. See, e.g., Mirchel v. RMJ Sec. Corp., 205 A.D.2d 388, 390, 613 N.Y.S.2d 876 (1st Dept. 1994). In this case, plaintiff's long employment history is more than sufficient to provide the basis for plaintiff's breach of contract claim.

The second question is whether the parties reached a separate agreement about the Lilly contracts in which Derven agreed to waive or modify her commission amount. Both sides acknowledge that the Lilly contracts were of a different order of magnitude than the average Advantis contract. Both sides knew that Martin Hamblin would be receiving the lion's share of the payments (approximately 94.4% of the $1 million obesity contract price and 85.9% of the smaller HGH contract). Also, Avantis would have lost a great deal of money on the Lilly projects if Derven received an additional 10% off the top. While it is not unknown for a firm to take a loss on a project to build a relationship with a client, both sides agree that Habegger was not interested in taking a loss on these contracts in order to build a relationship with Eli Lilly – rather, it was Derven who fought to retain Advantis' share of the contract. Finally, both sides agree that it was Derven who suggested a 50% split of the margin amount, based in part on her realization that Advantis could not afford her regular commission rate.

However, the parties disagree about whether a waiver or modification in fact occurred.

Derven asserts that Habegger accepted her offer of 50% (or at least appeared to do so). Habegger asserts that he rejected Derven's suggestion, and instead offered 10% of the margin – approximately $5,800 – which Derven accepted before the Lilly contracts were finalized. A reasonable trier of fact might also conclude that no agreement was actually reached, and that Derven retained a right to her regular commission rate.

These disputed issues of fact go to the heart of this case. Defendant's motion for summary judgment on plaintiff's first cause of action must be denied.

Derven's third cause of action – unjust enrichment – is equally unfit for disposition on summary judgment.[5] The elements of such a claim are the enrichment of the defendant at the expense of the plaintiff, and that "equity and good conscience" require the plaintiff's recovery. Lake Minewaska Mountain Houses Inc. v. Rekis, 259 A.D.2d 797 (3d Dept. 1999). As with Derven's breach of contract claim, her claim for unjust enrichment is predicated on unresolved questions of material fact concerning the parties' dealings. Defendant's motion for summary judgment on this claim is denied.

*2. Violation of New York Labor Law*

Derven's second cause of action raises claims under New York Labor Law §§ 191-a through 191-c. Because plaintiff misreads the statute and its application to the known facts, defendant's motion for summary judgment dismissing this claim is granted.

New York Labor Law § 191-b protects "sales representatives" in their dealings with their

---

[5]Plaintiff's third cause of action as written includes both fraud and unjust enrichment claims. This court treats the two as separate claims for purposes of this motion.

principals, and sets out the requirements for payment of commissions. Section 191-c provides for double damages, in addition to fees and costs, in the event of a violation of § 191-b. However, both provisions must be read in light of § 191-a, which defines the term "sales representative."

According to § 191-a, a "sales representative" is "a person or entity who solicits orders in New York state and is not covered by [§ 190(6) and § 191(1)(c), which protect employees who earn commissions as part of their salary] *because he or she is an independent contractor*." N.Y. Labor L. § 191-a(d) (2006) (Emphasis added). In other words, salaried employees who receive commissions are protected under § 191(1)(c), while independent contractors are covered by §§ 191-a through 191-c.[6]

On the record before me, Derven is clearly not an independent contractor. First, she stated as much during her deposition. Derv. Dep. at 64. She also admits that she received a fixed salary and benefits in addition to her 10% commission, and was employed solely as a salesperson and project manager – not in any other capacity. As such, she does not fall within the definition of "sales representative" under § 191-a, and cannot claim the protections of § 191-b or § 191-c. Defendant's motion for summary judgment on these claims is granted.

*3. Fraud*

Derven's third cause of action alleges fraud in Advantis' negotiations with her regarding

---

[6]N.Y. Labor L. § 191(1)(c) requires the timely payment of wages to commission salesmen, but does not provide for double damages or other penalties in the case of breach and does not create an independent cause of action apart from breach of contract. See Tierney v. Capricorn Investors, L.P., 189 A.D.2d 629, 632 (1st Dept. 1993). Furthermore, Derven's second cause of action does not recite a claim under § 191, but rather under §§ 191-a through 191-c.

her commissions on the Lilly contracts. Defendant moves for summary judgment on the grounds that plaintiff has failed to meet her burden of production on all elements of her claim. Defendant's motion is granted.

"The elements of a cause of action for fraud are a representation concerning a material fact, falsity of that representation, scienter, reliance and damages." <u>Stuart Silver Assoc., Inc. v. Baco Dev. Corp.</u>, 245 A.D.2d 96, 98, 665 N.Y.S.2d 415 (1st Dept.1997). "[R]elief does not lie for fraud resting on an intention not to perform. A fraud action is permitted, however, where the plaintiff alleges that the defendant engaged in other fraudulent conduct besides entering the contract with no intention to perform." <u>Grappo v. Alitalia Linee Aeree Italiane, S.p.A.</u> 56 F.3d 427, 434 (2d Cir. 1995) (internal citations omitted). Where "the only fraud alleged relates to the breach of contract, the mere addition of allegations of scienter does not give rise to a cause of action seeking damages for fraud." <u>Guterman v. RGA Accessories Inc.</u>, 196 A.D.2d 785, 786 (1st Dept. 1993).

Such is the case here. According to her own testimony, Habegger's sole representation to her about commission levels was the statement that he was "open" to splitting the margin on the Lilly contracts. Plaintiff believes that his statement was an objective acceptance of her offer. However, she offers no proof that such a statement was made with the purpose of fraudulently inducing plaintiff's performance as an employee. In fact, Habegger *was* open to splitting the margin – he continued to negotiate with Derven regarding her commission well into October. Furthermore, Derven admits that Habegger wanted to back out of the obesity project entirely in exchange for a finder's fee, and it was she who insisted on retaining a more active role for Advantis.

Either defendant breached its contract or it did not. However, a breach of contract case is not also a tort. TVT Records v. Island Def Jam Music Group, 412 F.3d 82, 92 n.7 (2d Cir. 2005); Grappo v. Alitalia Linee Aeree Italiane, S.p.A., 56 F.3d 427, 434 (2d Cir. 1995); Guterman v. RGA Accessories Inc., 196 A.D.2d at 786; Kotick v. Desai, 123 A.D.2d 744, 745-46 (2d Dept. 1986); Briefstein v. P.J. Rotondo Const. Co., 8 A.D.2d 349, 351 (1st Dept. 1959). The facts before me are wholly inadequate to support her burden of production, let alone proof, on the elements of falsity and expected reliance necessary to support a cause of action for fraud.

Defendant's motion for summary judgment as to these claims is granted.

C. Plaintiff's Motion for Summary Judgment on Advantis' Counterclaims

Defendant's amended answer raises counterclaims alleging misappropriation of trade secrets, unfair competition, and breach of plaintiff's duty of loyalty. Plaintiff seeks summary judgment on all counterclaims. For the reasons set forward below, I find that numerous questions of material fact preclude summary judgment.

*1. Breach of Duty of Loyalty and Good Faith*

Advantis' first counterclaim alleges that Derven breached her duty of loyalty and good faith to her employer. The conflicting accounts of Derven's conduct preclude summary judgment on this claim.

"It is well established that an employee is prohibited from acting in any manner inconsistent with his or her employment and must exercise good faith and loyalty in performing his or her duties and may not use his or her principal's time, facilities or proprietary secrets to build a competing business." Mega Group Inc. v Halton, 290 A.D.2d 673, 675 (3d Dept. 2002)

-17-

(internal citations omitted). Solicitation of customers away from one's employer to a competitor through "wrongful means" constitutes a breach of duty. Hayes v. Case-Hoyt Corp., 262 A.D.2d 1018, 1018 (4th Dept. 1999).

Derven asserts that her activities on behalf of Hudson after 2001 did not constitute a breach of the duty of loyalty and good faith, because while working for Hudson she continued to perform her duties for Advantis, and did not make use of Advantis' equipment in her home while performing activities for Hudson. As Derven worked from home, and was not directly supervised by Habegger at any point, there are no witnesses to her day-to-day conduct. However, Advantis has put forward more than sufficient evidence that Derven used Advantis' materials and office supplies, not to mention time and (possibly) trade secrets, in her dealings with Novartis. The fact that Advantis was itself pursuing Novartis, and that Derven was involved in this effort while pursuing her own relationship with Novartis, further supports Advantis' claims.

Summary judgment as to Advantis' counterclaim for breach of duty of good faith and loyalty is denied.

*2. Misappropriation of Trade Secrets and Unfair Competition*

Defendant's second and third counterclaims seek damages for misappropriation of trade secrets and unfair competition. New York follows the Restatement of Torts in determining whether information is in fact a trade secret. See Ashland Mgmt. Inc. v. Janien, 82 N.Y.2d 395, 407, 604 N.Y.S.2d 912 (1993). The Restatement sets forward the following factors for consideration:

> (1) the extent to which the information is known outside of [the] business; (2) the extent to which it is known by employees and others involved in [the] business; (3) the extent of measures taken by [the business] to guard the secrecy of the information; (4) the value of

the information to [the business] and [its] competitors; (5) the amount of effort or money expended by [the business] in developing the information; (6) the ease or difficulty with which the information could be properly acquired or duplicated by others

Id. (citing Restatement of Torts § 757, comment *b*). Despite these factors, the most important question before the trier of fact is whether or not the information is in fact secret. Lehman v. Dow Jones & Co., Inc., 783 F.2d 285, 298 (2d Cir. 1986).

There is significant disagreement over whether Advantis' methodology constitutes a trade secret. Both parties agree that the elements of Advantis' method are common tools in the industry; however, Habegger asserts that the aggregation of these tools is novel and are not generally known in the trade. The parties also disagree about whether Advantis' business practices, including its dealings with clients, employees, and consultants, are sufficient to pass the six factor Restatement test. On the record before me, I cannot dispose of these matters on summary judgment – whether defendant's method is in fact a trade secret, and whether that method is embodied in the materials and knowledge taken by Derven upon her departure from Advantis, must be determined at trial.

Plaintiff's motion for summary judgment as to defendant's second counterclaim for unfair competition is also denied. "The gravamen of a claim of unfair competition is the bad faith misappropriation of a commercial advantage belonging to another by infringement or dilution of a trademark or trade name or by exploitation of proprietary information or trade secrets." Eagle Comptronics, Inc. v. Pico Prods Inc., 256 A.D.2d 1202, 1203 (3d Dept. 2002). The questions material to the resolution of Advantis' claims for misappropriation are equally material to the resolution of this claim as well.

Derven's motion for summary judgment on defendant' second and third counterclaims

Comptronics, Inc. v. Pico Prods Inc., 256 A.D.2d 1202, 1203 (3d Dept. 2002). The questions material to the resolution of Advantis' claims for misappropriation are equally material to the resolution of this claim as well.

Derven's motion for summary judgment on defendant' second and third counterclaims must be denied.

## IV. Conclusion

For the reasons stated above, defendant's motion is granted as to Derven's claims of fraud and violation of New York Labor Law. Defendant's motion is otherwise denied. Plaintiff's motion for summary judgment is denied. A date for trial on the remaining claims and counterclaims will be scheduled at the earliest opportunity.

This constitutes the decision and order of the Court.

Dated: April 7, 2006

U.S.D.J.

BY FAX TO ALL COUNSEL